SYNAPTIC PHARMACEUTICAL
CORPORATION, Plaintiff,

v.

MDS PANLABS, INC.,
et al., Defendants.

No.. 00–CV–2728.

United States District Court,
D. New Jersey.

June 20, 2002.

454

John P. White, Norman H. Zivin, and Eric D. Kirsch, Cooper & Dunham, LLP, New York, NY, Neil S. Cartusciello, H. Lockwood Miller, III, Drinker, Biddle & Shanley, LLP, Florham Park, NJ, for Plaintiff.

Donald R. Ware, Denise W. DeFranco, Katherine M. Hamill, and Mark R. Reilly, Foley Hoag LLP, Boston, MA, Stephen R. Buckingham, Lowenstein Sandler PC, Roseland, NJ, for Defendants.

Jason D. Shanske, Iandiorio & Teska, Waltham, MA, for Movant.

**OPINION**

CHESLER, United States Magistrate Judge.

This matter comes before the Court on a motion brought by Defendant MDS Panlabs ("MDS"), for summary judgment of non-infringement in this action pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 56(c). For the following reasons, MDS's motion for summary judgment is GRANTED in part and DENIED in part.

*I. Background*

The Plaintiff in this action, Synaptic Pharmaceutical Corporation ("Synaptic") has brought this action to enforce its patents relating to biological testing. Synaptic is a biotechnology company located in Paramus, New Jersey that develops DNA cloning technologies used to discover new drugs and medicines. Synaptic has pat-

ented a process to determine whether certain chemical compounds will bind with certain proteins residing on the surface of human cells. Embedded in the outer layer, or membrane of the cell, these proteins, called "receptors", provide a mechanism for cells to react to a broad range of stimuli such as light, odorants, neurotransmitters and hormones. When a receptor binds to a given chemical compound, a reaction extends into the cell signaling it to perform or stop performing a particular function.

Synaptic illustrates how this process operates using the example of the relationship between adrenaline and the cells of the heart. Pl. Br. at 3. Heart cells have receptors embedded in their membranes.

> When the hormone adrenaline comes into contact with heart cells, it binds to a specific receptor in the membrane of the heart cells. This in turn causes a chemical reaction inside the cell, for example, signaling the heart cell to speed up its primary biological function (*i.e.*, to contract more frequently).

*Id.* Synaptic has developed tests, or "assays", to determine whether compounds like adrenaline will bind to receptors like those in the cells of the heart.

Synaptic was also among the first to discover that particular sequences of DNA are responsible for the presence or "cause the expression" of specific receptors in the cell membrane. *Id.* As a result, scientists at Synaptic can cause cells to express particular receptors by inserting DNA sequences into those cells regardless of whether such cells ordinarily express those receptors. These artificially created receptors and the assays that determine which compounds will bind to them are "extremely useful to pharmaceutical companies in their search for useful, effective

and safe new drugs and medicines." *Id.* at 4. Synaptic has brought this action alleging that MDS and Panlabs Taiwan, Ltd. ("Panlabs Taiwan") have infringed both its assay patents and its product patents that relate to the cells used in those assays.

MDS is a service organization, based in Bothell, Washington, that performs laboratory research and development. MDS provides a catalogue of its services to its clients and offers its services on-line through its website. Once a customer has selected a particular test to be performed on their product, they submit a "work order" to MDS and then forward their sample materials for testing directly to the testing facility. Approximately 80% of the pharmacological services listed in MDS's 2000 catalogue were conducted by MDS's affiliate, Panlabs Taiwan, a pharmacological testing company with its principal place of business in Taipei, Taiwan. Several tests conducted by Panlabs Taiwan for MDS's clients have given rise to the instant suit.

## II. Procedural History

On June 5, 2000, Synaptic filed a Complaint in the district of New Jersey alleging that MDS and Panlabs Taiwan infringed and are infringing twelve of its patents relating to (a) cloned human receptor genes, (b) cells expressing those receptors and (c) the use of those cloned receptors in analytical tests. On March 9, 2001, Panlabs Taiwan filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. On April 24, 2001, MDS filed a motion for summary judgment. The Court subsequently granted Synaptic's motion to amend and supplement its Complaint and Synaptic filed its First Amended Complaint ("Compl.") on January 22, 2002.[1] The motion to dismiss

---

1. The allegedly infringed assay patents are

numbered 6,156,518, 5,595,880, 5,882,855,

and motion for summary judgment were referred to this Court by Consent Orders dated March 26, 2002 and On April 17, 2002 respectively. On April 19, 2002, this Court denied Panlabs Taiwan's motion to dismiss.

### III. Discussion

Pursuant to Rule 56(c), a District Court is directed to grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir. 1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.1987). In other words, "[s]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir.1988). All facts and inferences are construed in the light most favorable to the non-moving party. *See Peters v. Del. River Port Auth. of Pa. and N.J.*, 16 F.3d 1346, 1349 (3d Cir.1994).

The substantive law will identify which facts are "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*

The party seeking summary judgment always bears the initial burden of production, *i.e.*, of making a *prima facie* showing that it is entitled to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This may be done either by demonstrating that there is no genuine issue of fact and that the moving party must prevail as a matter of law, or by demonstrating that the nonmoving party has not shown facts relating to an essential element of the issue for which it bears the burden. *Id.* at 322–23, 106 S.Ct. 2548. Once either showing is made, the burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. *Id.* at 324, 106 S.Ct. 2548.

However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder. *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir.1993). Therefore, to raise a genuine issue of material fact, the summary judgment opponent " 'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id.; see also Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").

5,786,157, 5,885,785, and 5,985,585 (collectively referred to as the "assay patents"). The allegedly infringed product patents are numbered: 5,861,309, 5,053,337, 5,882,855, 5,155,218, 5,661,024, 6,083,749 (collectively referred to as the "product patents"). The Amended Complaint withdraws Synaptic's allegations of infringement of the following patents: 5,360,735, 5,639,652, and 5,652,113 and adds the allegation of infringement of the 6,156,518 and 6,083,749 patents. Each patent will be referred to in the text of this opinion by its last three digits.

It is clear, however, that if a moving party satisfies its initial burden of establishing a *prima facie* case for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, "[t]here must ... be sufficient evidence for a jury to return a verdict in favor of the nonmoving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994).

In this case, MDS requests summary judgement finding no infringement of the majority of both Synaptic's assay patents and Synaptic's product patents. The Court will address each group of patents in turn before addressing the arguments raised by Synaptic regarding a conspiracy to infringe these patents.

## I. The Assay Patents

In its First Amended Complaint, Synaptic alleges infringement of six patents that contain assay claims:'518, '880, '855, '157,-'785 and '585. MDS now seeks summary judgement of non-infringement of these patents pursuant to four separate theories: (1) § 271(g) does not apply to the importation of reports from process patents; (2) § 271(a) does not apply to MDS's sales of assays performed in Taiwan; (3) without direct infringement of the patents, § 271(c) cannot be violated; and (4) materials for use in methods are not "components" for the purposes of § 271(f).[2] The Court will consider each of these arguments.

## 1) Reports as "Products" Under § 271(g)

■ Synaptic alleges that MDS has infringed 35 U.S.C. § 271(g) by importing reports from Panlabs Taiwan that contain the results of Synaptic's patented assays conducted in Taiwan. MDS responds that § 271(g) applies to the import of *tangible* goods made by patented *manufacturing* processes and therefore does not cover the import of test results from a patented assay. MDS bolsters this argument with quotations from legislative history that include references to manufacturing process patents and cites *Bayer AG v. Housey Pharmaceuticals. Inc.*, 169 F.Supp.2d 328 (D.Del.2001), a recent decision from the District of Delaware that has restricted § 271(g)'s application to exclude methods of scientific research. Synaptic responds by arguing that the results of assays are the products of a patented process and that the legislative history supports a reading of the statute that would protect them. Synaptic also argues that the *Bayer* decision was incorrectly decided, distinguishable from the facts of this case and not binding on this Court.

■ While the United States' patent laws have no extraterritorial effect, *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972),[3] § 271(g) provides that a com-

---

**2.** In its original Complaint, Synaptic alleged that MDS's 5–$HT_{1D}$ assay infringed the '157 patent. Synaptic's First Amended Complaint has added the accusation that Synaptic's 5–$HT_{1B}$ assay also infringes the '157 patent. As a result, MDS has clarified that it seeks only partial summary judgment with respect to whether the 5–$HT_{1D}$ assay infringes the '157 patent. Def. Rep. Br. at 6–7 n.7. It is also

worthy of note that the '855 patent contains only one assay claim, claim 13, and as a result, the Court's assay patent discussion is limited to that claim of the '855 patent.

**3.** Plaintiff questions the validity of the *Deepsouth* decision after the Federal Circuit's comments in *Rotec Industries, Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1260–1261 (Fed.Cir.

pany located in the United States who "without authority imports into the United States or offers to sell, sells, or uses within the United States, a product which is made by a process patented in the United States" will be liable for patent infringement. 35 U.S.C. 271(g) (2001). As a result, while § 271(g) does not prohibit the unauthorized use of process patents in foreign jurisdictions, it does prohibit parties in the United States from importing the products of those process. Here Synaptic argues that MDS has done just that by importing the results of patented tests conducted by Panlabs Taiwan in Taiwan. Therefore, to apply § 271(g) to this case, the Court must determine whether the information contained in the reports that MDS provides to its customers constitutes a "product which is made by a process" within the meaning of this statute.

The Court will begin this inquiry by looking to the statutory regime as a whole. The United States patent laws protect a patentee's rights to a "process, machine, manufacture, or composition of matter" 35 U.S.C. § 101 (2001). Synaptic's assays appear to fall under the statute's definition of "process," defined as a "process, art or method, [including] a new use of a known process, machine, manufacture, composition of matter, or material." 35 U.S.C. § 100(b) (2001). Section 100 does not, however, define the term "product." Therefore, while Synaptic's tests may be considered "processes" for the purpose of § 100(b), it is unclear from the definitions in the statute whether the test results

would be considered "products" such that they should be afforded protection by § 271(g). Likewise, there is no definition in the statute for the term "made" in § 271(g)'s phrase "product which is made by a process." As a result, it remains unclear from the statute's definitions whether the result of a test should be considered a "product" "made" by that test for the purpose of § 271(g). As outlined below, the structure of the § 271(g) provides little further help on this question.

In light of the potentially broad implications of penalizing the importation of products of patented processes, Congress enacted two limits to § 271(g) that confine the statute's scope to those products that are relatively proximate to the patented process in question. Thus imported products from patented processes will not be protected where they have been "materially changed by subsequent processes," 35 U.S.C. § 271(g)(1) (2001), or become "a trivial and nonessential component of another product." 35 U.S.C. § 271(g)(2) (2001). As a result, the statute will prevent the importation of products with a relationship to a process that is "immediate (for example a method of synthesizing a chemical compound and the compound itself)," whereas products will not infringe where their relationship to the patented process is too "remote ([e.g.] a method of air-conditioning a factory and the products manufactured in the factory.)" 5 Donald S. Chisum, *Chisum On Patents* § 16.02[6][d][iv] (1978).[4] In this case, the

2000). While the court in *Rotec* recognized that contrary to the holding in *Deepsouth,* the supply of components of a patented apparatus for combination outside the United States now constitutes infringement, *id., Deepsouth* continues to be cited by the Federal Circuit for the principle that the United States' patent laws have a limited territorial effect. *See e.g. Waymark Corp. v. Porta Sys. Corp.,* 245 F.3d 1364, 1367 (Fed.Cir.2001).

4. One commentator has determined that given this spectrum, "products that have no physical connection to the patented process do not fall within the scope of section 271(g)." Glenn Law, Note, *Liability Under the Process Patent Amendments Act of 1988 For The Use Of A Patented Process Outside The United States,* 60 Geo. Wash. L.Rev. 245, 266 (1991).

results of Synaptic's patented tests seem to fall in the middle of this spectrum.

As an initial matter, the results of patented assays are the direct product of the patented testing process. Synaptic holds the patent for these assays so that it can protect a particular method of testing materials. The result of these tests is the precise outcome that gives value to those patents. These results, however, have no physical connection to the components that they test and apart from the data that is yielded by the test, these processes have no real tangible outcome. Therefore, while the results in these tests are neither "materially changed" nor "component[s] of other processes," it remains unclear whether they can be considered products "made by a process" according to the plain language of § 271(g).

█ Generally, "where the terms of a statute are unambiguous, judicial inquiry is complete," *Adams Fruit Co., Inc. v. Barrett,* 494 U.S. 638, 642, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990) (citation omitted), however, where, as here, "the statutory language is ambiguous or unclear, we may look behind the language to the legislative history for guidance." *Collinsgru v. Palmyra Bd. of Educ.,* 161 F.3d 225, 233 (3d Cir.1998) (*citing United States v. Sherman,* 150 F.3d 306, 313 (3d Cir.1998)). Because the statute does not define "product" and it is unclear from the plain reading of § 271(g) whether the results of diagnostic processes are products which are "made by processes," the Court will look to legislative history for guidance.

At the outset, it appears from the legislative history that Congress intended to provide general protection for all process patents without "justification for discriminating against certain types of process inventions." S. REP. NO.100–83 (1987), *reprinted in* 9 Donald S. Chisum, *Chisum On Patents* App. 25 at 64 (2002) (hereinaf-

ter referred to as "S.R."). As the Federal Circuit has recognized, before the passage of this statute, "the holder of a United States process patent had no recourse against one who practiced the process abroad and imported the product[; therefore,] the purpose of § 271(g) was to close this loophole and bring the United States law into conformity with that of other nations." *Ajinomoto Co., Inc., v. Archer–Daniels–Midland Co.,* 228 F.3d 1338, 1347 (Fed.Cir.2000). In order to adequately achieve this goal, Congress recognized that it was "necessary to consider the patented process and the resulting product as a whole, with the consequence that process protection is automatically extended to the resulting product even if the said product has not been claimed." S.R. at 43 (citation omitted). When determining the precise scope of this protection, however, Congress did not specify in the statute "what products will be considered to have been "made by" the patented process, apparently because [it] wanted the courts to resolve this critical question of proximity to the product of the patented process on a case-by-case basis." *Bio–Technology General Corp. v. Genentech, Inc.,* 80 F.3d 1553, 1561 (Fed.Cir.1996) (*citing* S. REP. NO.83, 100th Cong., 1st Sess. 46 (1987) ("Inevitably the courts will have to assess the permutations of this issue of proximity to or distance from the process on a case-by-case basis."); and *id.* at 49 ("The Committee expects the courts to exercise careful judgment in distinguishing those products that are too far removed from the patented process, and those that have been changed only in insignificant ways.")). While it appears that Congress intended to delegate some discretion to the courts to determine whether a given product was too remote from a patented product to receive protection, these signals provide no guidance as to whether "results" are in the

*category* of products that Congress intended to protect.

■ Although its focus is on the importation of products, the House Report makes it clear that § 271(g)'s primary intent is to preserve the force of the patented processes that create those products. Despite this intent to protect process patents, however, nowhere in the statute or the legislative history is there explicit mention of patents for testing methods. Indeed, the House Report makes passing reference to manufacturers, and their goods, *see e.g.* H.R. REP. NO.100–60 (1987), *reprinted in* 9 Donald S. Chisum, *Chisum On Patents* App. 25 at 21 (2002), but there is no explicit reference to the need to protect the results of patented tests or assays. Moreover, there is some evidence to suggest that Congress understood that the kind of tests that Synaptic has patented were in a separate category of patents than those protected by § 271(g).

As noted above, the definition of "process" for the statutory scheme in general includes patents for methods of use—and as a result would appear to include diagnostic patents like those held by Synaptic. 35 U.S.C. § 100. When discussing § 271(g) in particular however, the Senate Report appears to create a distinction between different categories of process patents that excludes method patents from the scope of § 271(g). The Report states that "U.S. patent laws recognize three basic types of inventions for which patents may be obtained: products, methods of use, and methods of manufacture. Patents on the last are also known as process

patents, that is patents on process inventions." S.R. at 41.[5] The Report then goes on to discuss § 271(g) as an important step in the protection of process patents. By defining methods of manufacture as "process patents" as distinct from "methods of use," Congress appears to exclude methods of use from the purview of the statute. This definition is by no means conclusive. It does, however, provide further evidence for the conclusion that Congress may not have intended § 271(g) to apply to the results of diagnostic assays. Absent a clearer, affirmative expression of Congressional intent to extend protection to assay patents, this Court is reluctant to do so.

This conclusion is strengthened by the fact that it would not have been difficult for Congress to have provided more guidance in these circumstances. By indicating specific limits on the use of information that is derived from process patents in the statute itself, or even addressing such patents in the Congressional record, Congress could have established whether such patents fell under the umbrella of this statute's protection. The absence of such indicators seems to suggest that the specific challenges presented by diagnostic process patents were not foremost in the minds of legislators when drafting this provision. Given the increasing importance of assay patents in the development of the biotech industry and the need to protect these patents from abuse from foreign companies that seek to benefit domestically from their use abroad, such protection would further the purpose of § 271(g). It appears at this stage, however, that Con-

---

5. *See also* 134 CONG. REC. S4843–01 (daily ed. April 27, 1988) (statement of Sen. DeConcini) ("The U.S. patent laws recognize three basic types of inventions for which patents may be obtained: products, methods of use, and methods of manufacture. Patents on the last are also known as process patents. Process

patents have become increasingly important to a number of industries, especially in the areas of industrial and pharmaceutical chemicals, optical fibers, and above all in the field of biotechnology and bioengineering research.")

gress did not specifically anticipate these challenges. Without more specific guidance from Congress the Courts cannot now read in such protection.

As the Defendant points out, a recent decision from the District of Delaware supports this conclusion. *See Bayer AG v. Housey Pharmaceuticals. Inc.*, 169 F.Supp.2d 328 (D.Del.2001). When considering whether research patents relating to methods for discovering drugs were protected by § 271(g), the *Bayer* court found that section 271(g) "addresses only products derived from patented manufacturing processes, i.e., methods of actually making or creating a product as opposed to methods of gathering information about, or identifying, a substance worthy of further development." *Bayer*, 169 F.Supp.2d at 330. The *Bayer* court based this determination on the fact that the Federal Circuit had yet to extend the application of § 271(g) beyond the context of manufacturing, *id.* The *Bayer* court was also concerned about the scope of the potential impact of expanding liability to include protection for patents for methods of testing. *Id* at 330 n. 2. While the *Bayer* court's initial observation about the Federal Circuit can be explained by the absence of an opportunity for the Federal Circuit to consider these facts,[6] the *Bayer* court's concerns regarding the scope of the statute raise important questions for the instant case.

As the *Bayer* court recognized, the application of § 271(g) to testing methods would mean that "any products subjected to those methods in foreign countries

would infringe those patents upon importation to the United States." *Id.* This Court agrees with the *Bayer* court's conclusion that "[s]uch sweeping liability is beyond the scope of the statute." *Id.* Indeed, if this statute was· read to penalize the importation of the results of diagnostic tests, then the mere receipt by fax or telephone of the results of a patented pregnancy test conducted abroad would ground liability for patent infringement. More significantly, if "results" are "products" under this statute, then this legislation could be applied to· assign liability to the importation of ideas. A scientist who observes a patented test in a foreign jurisdiction and then returns home to the United States— with the memory of that test result in his mind—would, by his own journey, import a "product which is made by a process" and would thus be liable under § 271(g). The Defendants suggest an equally telling example of a library that imports a journal that has published patented test results. If the results of tests were considered "products" made by processes—as understood in § 271(g)—then the library's importation of the results of the test would also run afoul of this statute. Def. Rep. Br. at 9–10. As these examples readily demonstrate, the application of § 271(g) to the intangible milieu of test results—or the products of diagnostic patents—quickly leads to a host of absurd results. Given these potential outcomes, the Court concludes that such scope was not the intent of Congress.

While the protection of diagnostic patents like those presented here may be a

---

**6.** In the cases cited in *Bayer,* the Federal Court did not have the opportunity to consider the impact of § 271(g) on facts like those of the instant case that involve process patents for testing methods. *See e.g. Bio–Technology Gen. Corp. v. Genentech, Inc.,* 80 F.3d 1553, 1560–61 (Fed.Cir.1996) (importation of hormone made by patented recombinant DNA

techniques); *Eli Lilly & Co. v. Am. Cyanamid Co.,* 82 F.3d 1568, 1571–73 (Fed.Cir.1996) (importation of antibiotic falls into exception for "materially changed" materials); *Mars, Inc. v. Nippon Conlux Kabushiki–Kaisha,* 855 F.Supp. 670, 672 (D.Del.1993), *aff'd,* 58 F.3d 616 (Fed.Cir.1995) (importation of an electronic coin changer in vending machine).

laudable aim, without direct reference to diagnostic patents and the problems inherent in narrowing the scope of their protection, the Courts cannot establish such protection independently. Such action would inappropriately exercise legislative authority not delegated to the judicial branch of government. *See e.g. In re Central R. Co. of New Jersey,* 485 F.2d 208, 215 (3d Cir. 1973). As the Third Circuit has cautioned, if this Court was "not a judicial body but a legislative body, it could fashion perhaps a more equitable system .... Such is not our prescribed role, however, as enticing as such assignment might be. Instead, our task is to apply the statute Congress has enacted unless such statute inexorably conflicts with the Constitution." *Id.* Following this advice, the court concludes that, despite its general intent to preclude the import of the products of patented processes, § 271(g) is not structured broadly enough to provide protection for diagnostic patents like those presented here by Synaptic. In light of the foregoing observations, the Court is unwilling to extend § 271(g) to cover the products of diagnostic process patents. Such an interpretation would make this section susceptible to absurd applications and extend its scope beyond Congressional intent. As a result, MDS's motion for summary judgment of non-infringement with respect to § 271(g) is granted.

### 2) Offers to Sell Under § 271(a)

■ In its motion for summary judgment, MDS argues that it has not directly infringed 35 U.S.C. § 271(a) because it has not performed any of the accused assays in the United States since the issuance of the patents. Synaptic responds that through its catalogues and website, MDS violates § 271(a) by offering to sell binding assays that infringe Synaptic's patents. MDS replies that those tests are conducted in Taiwan and "neither the distribution of catalogs relating to services performed abroad nor the purchase of services performed abroad can constitute an offer to sell or a sale in the United States within the meaning of § 271(a)." Def. Rep. Br. at 10.

■ One of the of reasons Congress added the "offer to sell" language to § 271(a) was to prevent potential infringers from "generating interest in a potential infringing product to the commercial detriment of the rightful patentee." *3D Systems, Inc. v. Aarotech Laboratories, Inc.,* 160 F.3d 1373, 1379 (Fed.Cir.1998). This protection, however, is limited to sales that take place within the United States. As Federal Courts have recognized, "an 'offer to sell' made *within* the United States that contemplates a 'sale' of goods *outside* of the United States is not within the permissible scope of liability for 35 U.S.C. § 271(a)." *Cybiotronics, Ltd., v. Golden Source Elecs., Ltd.,* 130 F.Supp.2d 1152, 1171 (C.D.Cal.2001); *see also Quality Tubing, Inc., v. Precision Tube Holdings Corp.,* 75 F.Supp.2d 613, 624 (S.D.Texas 1999) ("the sale for which the offer is made must itself be an act of infringement.") The offers that MDS has made to sell assays in the United States, however, are readily distinguishable from those made in *Cybiotronics* and *Quality Tubing.*

In *Cybiotronics,* the court found that while there may have been offers made in the United States, those offers did not contemplate sales within the United States. In that case, the sale in question was negotiated, executed and performed in Hong Kong, and therefore, there was "no 'other place' where the 'sale' might be said to have taken place, because *all* of the essential activities took place outside the United States." *Cybiotronics,* 130 F.Supp.2d at 1173 (emphasis in original). In *Quality Tubing,* the court found that

the defendant had not violated § 271(a) by "contracting, in the United States, to manufacture, sell, and deliver a product in Scotland and Norway, for use in Norway." *Quality Tubing,* 75 F.Supp.2d at 625. In this case, by contrast, while the testing in question took place in Taiwan, all of the essential activity pertaining to the offer and sale of that activity has taken place in the United States. MDS is a company based in the United States, with its headquarters in Washington state. Its customers that are the subject of this suit are based in New Jersey, and the results of their purchased assays are delivered to them in the United States. As the court in *Cybiotronics* recognized, § 271(a) does provide liability in cases such as these where "the sale that is *contemplated* by the 'offer' is or will also be consummated within the United States." *Id.* Given the fact that MDS offers to sell the allegedly infringing assays in the United States and that these sales are consummated in the United States, the Court finds that there is insufficient grounds upon which to grant summary judgment at this time with regard to violations of § 271(a).

### 3) Contributory Infringement Under § 271(c)

In its response to MDS's motion for summary judgment, Synaptic argues that MDS's importation of membrane preparations for their subsequent use in assays conducted by Panlabs Taiwan violates 35 U.S.C. § 271(c). MDS replies that because it has not preformed the patented assays within the United States, Synaptic cannot make out a claim for direct infringement of its patents. MDS concludes that without a claim for such a direct infringement, as a matter of law, their can be no contributory infringement under § 271(c).

In order to establish contributory infringement a plaintiff must show both the knowledge that the activity would contribute to infringement, *Hewlett-Packard Co. v. Bausch & Lomb, Inc.,* 909 F.2d 1464, 1469 (Fed.Cir.1990), and direct infringement of the patent. *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 687 (Fed.Cir.1986). Process patents, like Synaptic's Assay Patents in this case, are only directly infringed by the performance of the patented process. *Joy Technologies, Inc., v. Flakt, Inc.,* 6 F.3d 770, 773 (Fed.Cir.1993) (citations omitted). Here, MDS cites *Standard Havens Prods., v. Gencor Indus.,* 953 F.2d 1360, 1374 (Fed.Cir.1991), in support of its argument that there is no direct infringement of Synaptic's patents because there is no evidence that the patented process would be carried out in the United States. This case is readily distinguished from that of *Standard Havens,* however, for as the court in that case recognized, there was "no evidence in the record showing that the foreign [company] shipped products back to the United States made abroad by the patented process, *see* 35 U.S.C. § 271(g) (1988)." *Id.* In this case, by contrast, there is evidence that Panlabs Taiwan offered to sell assays in the United States that may infringe Synaptic's patents. As the Court noted above, if established, this conduct could support a finding of patent infringement pursuant to § 271(a). Given this Court's determination that MDS's activities may constitute infringement, MDS's unsubstantiated claim that there is no primary infringement on which to base a claim for contributory infringement is insufficient to ground summary judgment at this time.

### 4) Components Of A Patented Invention Under § 271(f)

In its opposition to MDS's motion for summary judgment, Synaptic submits

that there remain disputed material issues of fact as to whether MDS's "conduct in supplying cells, membrane preparations, validation studies, protocols and laboratory equipment to Panlabs Taiwan," Pl. Br. at 30, constitute the supply of components of a patented invention in violation of 35 U.S.C. § 271(f). MDS replies that, as a matter of law, § 271(f) does not apply to method patents because they have no "physical objects capable of being combined as described in § 271(f)," Def. Rep. Br. at 15, and that in this case, the "cells or membrane preparations supplied to Panlabs Taiwan do not and cannot constitute 'components' within the meaning of § 271(f)." *Id.* at 15–16.

 Section 271(f) assigns liability to actors in the United States who seek to circumvent the application of the patent laws by exporting elements of patented devices which are subsequently combined internationally. Section (f)(1) prohibits the unauthorized export of "all or a substantial portion of the components of a patented invention," where the exporter then actively induces their combination. 35 U.S.C. § 271(f)(1). Section 271(f)(2) prohibits the unauthorized supply of "any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use," where the infringer knows that such component is so made or adapted and intends it to be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. 35 U.S.C. § 271(f)(2) (2001).

While § 271(f) protects against the export of components of patented inventions, courts have determined that it does not protect against the foreign use of process patents. *See Standard Havens Products, Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360,

1374 (Fed.Cir.1991); *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 955 F.Supp. 220 (S.D.N.Y.1997); *Enpat, Inc. v. Microsoft Corp., et al.*, 6 F.Supp.2d 537, 539 (E.D.Va.1998). In *Enpat*, the District Court reasoned that the express language singling out process patents for protection in § 271(g) indicated that "Congress knew how to protect against foreign use of process patents, and chose to limit such protection to uses which result in the introduction of products into the United Sates." 6 F.Supp.2d 537 at 539. The Court went on to note that because processes were not explicitly included in the text of the statute, "the language and legislative history of § 271(f) demonstrate an exclusive focus on the sale of components patented in the United States for combination into a finished product, apparatus, or invention abroad." *Id.* Anticipating Synaptic's arguments that a process also involves the combination of materials, the court stated that "[w]hile it is true that any process involves the use of physical objects, this alone is not enough to bring a method patent within the purview of § 271(f)." *Id.*

Given these court's determinations that § 271(f) does not apply to method patents, this Court will refrain from extending § 271(f) liability to MDS's activities with regard to Synaptic's assay patents. As a result, the Court determines that MDS cannot have violated § 271(f) with regard to Synaptic's assay patents and correspondingly grants summary judgement of non-infringement with respect to MDS's § 271(f) liability for infringing Synaptic's assay patents.

## II. The Product Patents

In its First Amended And Supplemental Complaint, filed on January 22, 2002, Synaptic alleges that MDS infringed six of its product patents numbered: '337, '218, '024, '309, '855, and '749.

The Court will consider the parties' arguments with respect to the product patents named in Synaptic's original Complaint and then turn to the newly added '749 patent.

### 1. The '337, '218, '024, '309 and '855 Patents

With respect to the '337, '218, '024, '309 and '855 patents, the Court will begin by considering the parties arguments for literal infringement before addressing the doctrine of equivalents.

### A) Literal Infringement

██ MDS argues that it has not literally infringed the '337, '218, '024, '309 or '855 product patents because they all are based on independent claims for isolated nucleic acid or "DNA" molecules, Def. Rep. Br. at 19, whereas MDS supplies Panlabs Taiwan with "membrane preparations." Mitchell Decl. ¶ 13. MDS argues that because these patents all contain independent claims for isolated nucleic acid molecules, and MDS does not supply products that contain such materials, MDS cannot literally infringe Synaptic's patents. For its part, Synaptic does not appear to contradict this claim.

Nowhere in its submissions does Synaptic substantiate a claim of literal infringement. *See* Pl. Br. at 31–38. In every instance in which Synaptic does address the infringement of the '337, '218 and '214 product patents, it is in the context of an infringement through the doctrine of equivalents. *See e.g.* Pl. Br. at 32 ("Panlabs imports ... membrane preparations for the purpose of supplying them to Panlabs Taiwan ... These membrane preparations ... are *equivalent* to the cells expressing the same receptors in Synaptic's Product patents") (emphasis added). While Synaptic does allege that MDS has infringed its '309 and '855 patents by the

sale of cells to Panlabs Taiwan, Pl. Br. at 37, nowhere does it allege the sale of a DNA molecule encoding the patented receptors which would literally infringe these patents.

██ An accused product will be found to literally infringe "if every limitation recited in the claim appears in the accused product, i.e., the properly construed claim reads on the accused product exactly." *Jeneric/Pentron, Inc. v. Dillon Company, Inc.,* 205 F.3d 1377, 1382 (Fed.Cir.2000). In this case, Synaptic has offered no argument or evidence that MDS has literally infringed any of its product patent claims. As a result, the Court determines that MDS has not literally infringed the '337,- '218, '024, 309, or 855 patents. Given this finding, the Court grants partial summary judgment with respect to the literal infringement of these product patents. The Court will now consider whether MDS has infringed Synaptic's product patents through the doctrine of equivalents.

### B) The Doctrine of Equivalents

██ MDS argues that it cannot be found to have infringed Synaptic's product patents through the doctrine of equivalency because it has not employed an equivalent to the DNA molecules that comprise the independent claims in Synaptic's patents.

Synaptic does not contradict the argument that there has been no equivalent infringement of its independent claims, but rather focuses its arguments for patent infringement on its patents' dependent claims for cells expressing receptors. Pl. Br. at 31 ("claims 28 through 33 of the '337 patent concern cells that express the adrenergic $\alpha_{2B}$ receptor; claim 11 of the '218 patent concerns cells that express the serotonin $5-HT_{1D}$ receptor; and claims 7 and 14 of the '024 patent concern cells that express the serotonin $5-HT_{2A}$ receptor.")

(citation omitted). With respect to the '309 and '855 patents, Synaptic does not appear to make any argument that there has been an infringement by equivalence. While Synaptic argues that MDS has infringed its '309 and '855 patents by selling cells to Panlabs Taiwan, Synaptic makes no argument that MDS's use of cells or cell membranes is equivalent to its patented products.

Absent any argument that those cells or cell membranes allegedly sold to Panlabs Taiwan are equivalent to the products patented by Synaptic, the Court will grant summary judgement of non-infringement with regard the '309 and the '855 patents. The Court must still consider Synaptic's arguments with regard to the '337, 218 and '024 patents.

 When determining if the accused product infringes a given claim, a "claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers." 35 U.S.C. § 112, ¶ 4 (2001); see also Jeneric/Pentron, Inc. v. Dillon Company, Inc., 205 F.3d 1377, 1383 (Fed.Cir.2000) ("dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed.") (citing Wahpeton Canvas Co., v. Frontier, Inc., 870 F.2d 1546, 1553 (Fed.Cir.1989)). As a result, a product that does not infringe an independent claim will not infringe claims that are dependent on that claim.

In this case, Synaptic has not argued that MDS has infringed the independent claims of its product patents. This is clear, for example, when Synaptic elaborates its argument that it is not estopped from arguing equivalency. Synaptic states clearly that it "is claiming that membrane preparations are equivalent to cells; Synaptic is not claiming an equivalent to the sequence of DNA molecule that encodes

the human 5–HT$_{1D}$ receptor in claim 1." Pl. Br. at 34; see also id. at 35 ("Synaptic is not claiming an equivalent to the ['024 patent's] DNA sequence element"). While Synaptic attempts to insulate its dependent claims from the bar against equivalency, this statement clarifies its position with regard to the independent claims: Synaptic does not allege an infringement of its independent claims of its product patents. Without an infringement of these patents' independent claims, however, Synaptic cannot make out an infringement of its dependent claims.

This is true for each of the claims that Synaptic alleges have been infringed by equivalent membrane preparations. Claims 28 through 33 of the '337 patent all ultimately depend on claim 1 of the '337 patent which claims "[a]n isolated nucleic acid molecule encoding a human alpha 2B-adrenergic receptor." Reilly Decl. Exh. 3 at 11. Similarly, claim 11 of the '218 patent is ultimately dependent on claim 1 of the patent which claims "[a]n isolated DNA molecule encoding a human 5HT$_{1D-1}$ receptor having the coding sequence shown in FIGS. 3A and 3B." Reilly Decl. Exh. 5 at 27. Finally, claims 7 and 14 of the '024 patent are also ultimately dependent on claim 1 of that patent which claims "[a]n isolated nucleic acid molecule encoding a human 5–HT$_2$ receptor having the amino acid sequence as shown in FIGS. 2A–2G." Reilly Decl. Exh. 7 at 12. Synaptic claims that MDS has infringed its '309 and '855 patents because the cells its supplies to Panlabs Taiwan "express the adrenergic $\alpha_{2B}$ receptor and cells that express the dopamine D$_5$ receptor." Pl. Br. at 37. In these cases, Synaptic makes no specific allegation regarding which claim MDS has infringed, let alone corroborate an allegation that it has infringed an independent claim of one of these patents. Given that each of the allegedly infringed claims are

themselves dependent on claims that Synaptic has not alleged have been infringed, Synaptic cannot support its allegations of infringement with respect to these product patents. As a result, the Court will grant summary judgment of non-infringement with respect to the'337, '218, '024, '309 and '855 patents.

### 2) The '749 Patent

Synaptic's claims of infringement of the '749 Patent were added to its First Amended And Supplemental Complaint, filed on January 22, 2002. No discovery has been taken with respect to this patent, Pl. Br. at 38, and as this claim was added after the submission of MDS's first summary judgement brief, the original motion contains no argument regarding its infringement. While MDS's Reply Brief suggests that the Court could grant summary judgement on the '749 patent for the same reasons that it argues summary judgement is appropriate for the '855,- '309, '337, '218, and '024 Patents, Def. Rep. Br. at 24, MDS does not explicit request summary judgment in its conclusion. *Id.* at 26.

Given that the parties have not yet fully briefed summary judgment on this patent and have yet to conduct any discovery with respect to the allegations of its infringement, summary judgment is premature at this time.

### III. Conspiracy

 Synaptic alleges in its Amended Complaint that "MDS Panlabs and Panlabs Taiwan have conspired with each other and with other companies to infringe Synaptic's listed patents-in-suit and have committed overt acts in furtherance of this conspiracy, resulting in damage to Synaptic." Compl. ¶ 13. With respect to the '337, '218, '024 patents, Synaptic argues that "Panlab[s] Taiwan's use of the adrenergic $\alpha_{2B}$, serotonin 5–HT$_{1D}$ and serotonin 5–HT$_{2A}$ membrane preparations to perform the patented assays can be attributed to Panlabs." Pl. Br. at 35; *see also id.* at 37–38 ("Panlabs act[s] in concert or conspiracy with Panlabs Taiwan to use the adrenergic $\alpha_{2B}$ and dopamine D$_5$ cells (or membrane preparations made from those cells) to perform the adrenergic $\alpha_{2B}$ and dopamine D$_5$ assays listed in Defendants' annual catalogs and website."). In response, MDS argues that "there is no cause of action for conspiracy to infringe a patent." Def. Rep. Br. at 24–25 (*citing* 35 U.S.C. § 271; *Cognitronics Imaging Sys., Inc., v. Recognition Research, Inc.,* 83 F.Supp.2d 689, 699 n. 15 (E.D.Va.2000)). MDS argues in addition that even if there were such a cause of action, the allegedly infringing activity took place abroad and cannot, therefore, give rise to an infringement action in the United States.

Synaptic has failed to cite any authority for its cause of action for "conspiracy to infringe" its patents. Neither has Synaptic alleged sufficient facts to warrant this court's piercing of the corporate veil and treating Panlabs Taiwan as MDS's alter ego. Another court in this District has noted that while "[e]vidence of conspiracy might be relevant to the issue of punitive damages for willful, malicious action in a civil action, [it] would not constitute a separate ground for recovery." *Rainville Co., Inc. v. Consupak, Inc.,* 407 F.Supp. 221, 223 (D.N.J.1976). Instead, the court in *Rainville* found that such evidence could better support an action in contributory infringement. This insight is no less relevant here. As mentioned above, Synaptic may have a claim in contributory infringement pursuant to § 271(c), these same facts, however, may not be used to create a cause of action for conspiracy to infringe. *See also Cognitronics,* 83 F.Supp.2d at 699 n. 15 (*citing Ernster v. Ralston Purina*

*Co.,* 980 F.2d 743, 1992 WL 279268, at *6 (Fed.Cir.1992)) (unpublished) ("Title 35 neither expressly nor implicitly authorizes additional and duplicative damages for conspiracy to infringe a patent"). Given the absence of a separate ground for recovery for conspiracy to infringe, the Court will grant MDS's motion for summary judgment with respect to Synaptic's claims of conspiracy to infringe its patents.

## IV. Conclusion

For the foregoing reasons, and in conjunction with an order issued this same day, the Defendant's motion for summary judgment is GRANTED in part and DENIED in part.

### ORDER

THIS MATTER having come before the court on the motion of Defendant MDS Panlabs, Inc. ("MDS Panlabs"), for partial summary judgment pursuant to Fed. R.Civ.P. 56; and the court having reviewed the moving papers and all other papers submitted in support thereof; and for good cause shown,

IT IS ON THIS 19th day of June, 2002;

ORDERED that MDS Panlabs' motion for summary judgment denying Plaintiff's claims of infringement pursuant to 35 U.S.C. § 271(g) regarding patents numbered 6,156,518; 5,595,880; 5,786,157; 5,885,785; 5,985,585; and claim 13 of patent 5,882,855 is GRANTED; and

IT IS FURTHER ORDERED that MDS Panlabs' motion for summary judgment denying Plaintiff's claims of infringement pursuant to 35 U.S.C. § 271(f) regarding patents numbered 6,156,518; 5,595,880; 5,786,157; 5,885,785; 5,985,585; and claim 13 of patent 5,882,855 is GRANTED; and

IT IS FURTHER ORDERED that MDS Panlabs' motion for summary judgment denying Plaintiff's claims that Defendants engaged in a "conspiracy to infringe" Plaintiff's patents-in-suit is GRANTED; and

IT IS FURTHER ORDERED that MDS Panlabs' motion for summary judgment denying Plaintiff's claims of infringement of patents numbered 5,861,309, 5,053,337, 5,155,218, 5,661,024, 6,083,749 and all claims but claim 13 of patent 5,882,-855 is GRANTED; and

IT IS FURTHER ORDERED that MDS Panlabs' motion for summary judgment denying Plaintiff's claims of infringement pursuant to 35 U.S.C. § 271(a) regarding patents numbered 6,156,518; 5,595,880; 5,786,157; 5,885,785; 5,985,585; and claim 13 of patent 5,882,855 is DENIED; and

IT IS FURTHER ORDERED that MDS Panlabs' motion for summary judgment denying Plaintiff's claims of infringement pursuant to 35 U.S.C. § 271(c) regarding patents numbered 6,156,518; 5,595,880; 5,786,157; 5,885,785; 5,985,585; and claim 13 of patent 5,882,855 is DENIED; and

IT IS FURTHER ORDERED that MDS Panlabs' motion for summary judgment denying Plaintiff's claims of infringement of the patent numbered 6,083,749 is DENIED.